UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENERGY INTERNATIONAL CORP.,

        Plaintiff,

                                    Case number 01-72988
v.                                     Honorable Julian Abele Cook, Jr.

CENTRAL SPRINKLER COMPANY,

        Defendant.

## ORDER

Pursuant to Federal Rule of Civil Procedure 52, the Court submits the following findings of fact and conclusions of law, all of which relate to the issues that were contested by the parties in the above-entitled matter during the bench trial in September 2005.

## FINDINGS OF FACT

I.       Energy's Breach of Contract Claim

This case involves claims by the Plaintiff, Energy International Corporation ("Energy"), who charges the Defendant, Central Sprinkler Company ("Central"), with having violated the parties' contractual agreement. During all of the times that are relevant to this controversy, Central was a manufacturer of automatic fire sprinkler products and grooved piping products.[1] Energy was a marketing and engineering company whose business included service as a sales representative and a distributor for manufacturers of mechanical and electrical construction components for heating, cooling, water, and fire suppression systems.

---

[1] Grooved piping products are generally used in pipeline and industrial systems, as well as in automatic sprinkler systems that are used for fire protection.

In March 1998, the parties entered into a verbal agreement, in which they agreed that Energy would be the exclusive sales representative and distributor for all of Central's grooved piping products in the Middle East.[2]  On March 6, 1998, Len Schiavone, the Vice President of Operations for Central, wrote to Ned Fawaz, the President of Energy, in which he confirmed the parties' exclusive arrangement with respect to certain specified countries in the Middle East. Approximately two weeks later  (March 23rd), Schiavone reaffirmed the parties' exclusive arrangement and added that "[t]his agreement will remain in effect until further written notification."

Shortly thereafter, Energy made plans to introduce  and sell Central's products in the Middle East.  These preparations included the development of a training program that was designed to familiarize its employees with Central's hardware,  visiting trade shows, talking with potential customers, and contacting key personnel in Middle Eastern governments.

In November 1998, Energy learned that a competitor (namely,  Dhabia Trading), after being provided with quotes for Central's products by Spraysafe, Inc.,[3] had attempted to consummate sales within the confines of the exclusive territory that had been designated by the parties in their contractual agreement. On November 25, 1998, Schiavone, upon learning of this encroachment into Energy's exclusive territory, forwarded a letter of apology to Fawaz in which he asserted that "Spraysafe will obviously withdraw the quote provided . . . ."

In July 1999, Dhabia Trading filed a lawsuit in the United Arab Emirates (UAE) that

---

[2] During this period of time, Energy represented approximately eighteen to twenty-five companies in the Middle East.

[3] Spraysafe was a subsidiary of Central.  Prior to the events in question, Spraysafe was authorized by Central in 1995, "to enter into distribution agreements on behalf of Central . . .; such agreements to have full legal affect as if entered into directly by Central Sprinkler Company."

challenged Energy's exclusive right to sell Central products. Acting upon Dhabia Trading's representations, the court froze Energy's inventory within the UAE.[4] Notwithstanding this pending litigation and the frozen assets, Central provided Energy with only a minimal amount of assistance in controlling the situation. In fact, Central supplied Spraysafe and Dhabia with pricing multipliers and other information in an effort to assist them in quoting and selling its grooved piping products within Energy's exclusive territory. Rather than attempting to address Energy's concerns with these encroachments into its exclusive sales territories, Central made a series of unsuccessful efforts to renegotiate the parties' agreement with an aim toward eliminating the exclusivity provision of their contract.

Around this same period of time, Energy was in the process of negotiating the development of several projects, such as those relating to the developments of the Golden Pyramid, the Grand Mosque, the Dokkae, and the Al Haram Hotel. However, Energy failed to secure these projects due, in part, to strong market competition from other vendors, including Victaulic, an established Middle East manufacturer of grooved products.[5]

On August 16, 1999, Tyco International ("Tyco") acquired Central and subsequently terminated its grooved piping business. In November of 2000, Energy was given official notification by Central that it intended to exit the grooved piping business, which effectively

---

[4]The UAE court ultimately dismissed the Dhabia's lawsuit against Energy.

[5]During the trial before this Court, Energy argued that these projects had not been secured because its reputation as the exclusive distributor of grooved products in the region had been severely impaired. According to Energy, these failings were caused by the Dhabia lawsuit and Central's lack of support. However, a review of the evidence does not support Energy's contention. As an example, Fawaz admitted that Energy only wins about 50% to 60% of the jobs on which it bids. *See* Trial Transcript of September 7, 2005 at 76-77. Furthermore, Fawaz noted in a 1998 marking report that "[t]he major share of the groove fittings market, a technology introduced to the area by Victaulic, has been given to Victaulic. . . . Victaulic has been enjoying the market at a rate of approximately $10 million a year."

terminated the parties' contractual relationship.

II   Central's Counterclaim

At the time when the parties' contractual relationship came to an end, Energy was indebted to Central in the sum of $59,196. Thereafter, Energy paid $13,122, which, in turn, left a balance of $46,074. Of this amount, Central gave Energy a credit in the amount of $15,000 and waived the associated late fees, leaving a balance of $26,245 which remains unpaid as of this date.

## CONCLUSIONS OF LAW

I   Basic Contract Law

In order to recover damages for a breach of contract in Michigan, an aggrieved party, such as Energy, has the burden of establishing (1) the existence of an enforceable contract, (2) the terms of the contract, (3) a breach of the contract, and (4) an injury which resulted from the breach. *See Webster v. Jones*, 197 F.3d 815, 819 (6th Cir. 1999). Central has acknowledged that the parties entered into a contractual agreement in March 1998 "whereby Energy would be Central's exclusive reseller and representative of Central's grooved piping products in the Middle East until one of them notified the other in writing[.]" Def.'s Prop. Findings Fact & Concl. Law at 31. Thus, the only issues left unresolved in this litigation are whether Energy has met its burdens of establishing that (1) Central breached the contractual agreement between the parties, and, if so, (2) the nexus between the claimed injury and the alleged violation of the parties' agreement. The Court will consider each issue seriatim.

II.   The Parties' Contractual Agreement

Notwithstanding the parties' contractual arrangement, Spraysafe consummated sales of Central's grooved piping products to Dhabia within Energy's exclusive territory. There is also evidence that Central's acquiescence to Dhabia's lawsuit, which challenged Energy's exclusive

contract with Central, violated the intent as well as the spirit of the parties' exclusive agreement. Nevertheless, Central submits that it "is not liable for the acts of its subsidiary [Spraysafe]." Although this is a correct recitation of an existing basic principle of law, Central, as a principal in this relationship, unquestionably allowed Spraysafe, under an implied agency relationship, to enter into distribution agreements on its behalf which became binding upon their execution.[6] Thus, Central's argument is without merit.

Central further contends that Spraysafe's sale to Dhabia involved grooved piping for fire protection systems, but not grooved piping for mechanical systems. However, this is an allegation that is not supported by the evidence. Notably, the parties did not make such a distinction in their contractual agreement.[7] Furthermore, there is no credible evidence which supports Central's assertion that such a distinction was ever agreed upon between the parties. Therefore, the Court determines that the parties' exclusive arrangement encompassed both grooved piping systems. As such, the Court concludes that Central breached the terms, as well as the spirit, of the parties' exclusive contractual agreement.

III.     The Nexus Between the Injury and the Damages

As the Plaintiff in this litigation, Energy has the burden of proving that its claimed damages

---

[6] Central contends that the parties' exclusive contractual arrangement was not a "distribution" agreement. Upon its review of the evidence, the Court finds no merit to this contention.

[7] Notwithstanding the silence within the contract on this point, Central contends that "Energy acknowledged, understood and accepted [this alleged breach] in its December 1998 Marketing Report," and, therefore, Energy "has waived any claim of breach." The Court disagrees. In examining the December 1998 Marketing Report, the Court has not found any language which suggests that Energy accepted Central's violation of the exclusivity provisions within their contract.

of $1,480,000 were caused by Central's breach of their contractual agreement.[8]

In Michigan, "[i]t is well settled that the appropriate measure of damages for breach of contract . . . is that which would place the injured party in as good a position as it would have been in had the promised performance been rendered." *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 463 (Mich. Ct. App. 1989). However, "[a] damage award must not be based on mere speculation, guess, or conjecture." *John E. Green Plumbing and Heating Co., Inc. v. Turner Constr. Co.*, 742 F.2d 965, 968 (6th Cir. 1984) (internal quotation marks and citation omitted). While "the law does not require impossibilities when it comes to proof of damages, . . . it does require whatever degree of certainty tha[t] the nature of the case admits." *Id.* (internal quotation marks and citation omitted) (alteration in original); *see also Jim-Bob*, 443 N.W.2d at 463; *Fera v. Village Plaza, Inc.*, 242 N.W.2d 372, 373-374 (Mich. 1976).

Here, Energy proffered brief and uncorroborated testimony which purportedly established its claim for damages. However, with Energy seeking an award in excess of over one million dollars, the Court is unwilling to accept uncorroborated testimony, especially in light of the nature of Energy's business where one would reasonably expect to see some paper trail of its financial transaction. *Cf. Fera*, 242 N.W.2d at 375. Energy has failed or neglected to proffer any documentation, such as receipts, purchase orders, cancelled checks, or invoices, which would support its estimation of damages. *See Archer v. Macomb County Bank*, 853 F.2d 497, 499 (6th 1988) ("[W]here the acts which constitute the violation occurred at specific, identifiable times and

---

[8]Energy asserts that its damages, all of which flowed from Central's breach of their contract, consists of (1) $500,000 in "start up" costs in anticipation of serving as Central's exclusive representative and distributor in the designated territory, (2) lost profits from the loss of sales in connection with the following projects: to wit, Grand Mosque ($200,000), Golden Pyramid ($200, 000), Al Haram Hotel ($60,000) and Dokkae ($500,000) and (3) loss of profits as a result of Spraysafe quotes.

where the victim is a business which presumably keeps accurate records, the proof of damages should be relatively specific and certain."); *Fera*, 242 N.W.2d at 375 ("The loss of profits are often speculative and conjectural on the part of witnesses. When this is true, the Court should deny loss of profits because of the speculative nature of the testimony and the proofs." (internal quotation marks omitted)). Accordingly, the Court must, and does, conclude that Energy has not met its burden of providing a reasonable degree of proof which would justify an award of damages.

Furthermore, the Court finds that Energy has failed to proffer an adequate degree of proof that its purported damages were caused by Central's breach. In this case, Energy maintains that Central's violation (i.e., its acquiescence to the Dubia lawsuit) had a negative impact upon its reputation as the exclusive reseller of Central's grooved piping products in the Middle East. As a result of this allegation, Energy claims that it lost profits from the several projects which have been identified hereinabove. This contention is without evidentiary support.

Initially, the Court notes that Energy has not sufficiently established that it secured, as opposed to having only engaged in negotiation, all of the projects about which it claims to have lost profits. If Energy had secured these million dollar projects, surely one would have expected to see, at the very least, some documentary evidence to support its claim. In fact, the parties stipulated that, in Energy's multi-step bidding process, "the customer reviews [Energy's] price quote, compares it to others, finds out the technical details and, if the customer is convinced that Energy International offers the best price and technical details, awards Energy . . . a written purchase order. . . . [I]f the owner or contractor issues a purchase order, Energy . . . prepares a written purchase order to the manufacturers it represents." Joint Final Pre-Trial Order at ¶ 6. Notwithstanding this representation, Energy has neglected to proffer any purchaser orders or the testimony from any of its purported customers for any of the projects about which it claims to have sustained a loss of profits.

Equally destructive to Energy's claims is its failure to proffer any credible evidence from which the Court could distinguish the profits that were lost due to the undisputed stiff market competition from its competitors, such as Victaulic, from those profits that were lost as a result of Central's breach. *See Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.*, 480 N.W.2d 623, 632 (Mich. Ct. App. 1991). The Michigan Court of Appeals noted in *Sullivan* that "an award under such circumstances would be improper." *Id.; see also Magnetic Prods., Inc. v. Puritan Magnetics, Inc.*, 1998 WL 1990464, *5 (Mich. Ct. App. 1998).

III.    Central's Counterclaim

In its defense, Energy argues that its breach, if any, should be rendered nonactionable because Central committed the first substantial violation of their contract. Citing *Michaels v. Amway Corporation*, 522 N.W.2d 703, 706 (Mich. Ct. App. 1994) (internal quotation marks and citation omitted), Energy proclaims that "[t]he rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." However, the *Michaels* court correctly observed that "[this] rule only applies when the initial breach is substantial." *Id.* In 1968, the Michigan Supreme Court in *Baith v. Knapp-Stiles, Inc.*, 156 N.W.2d 575, 579 (Mich. 1968) (internal quotation marks and citation omitted), opined that

> the words "substantial breach" in the ruling must be given close scrutiny. Such scrutiny discloses that the application of such a rule can be found only in cases where the breach effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration . . . or the prevention of further performance by the other party

Based on these facts, the Court concludes that Central's breach of the parties' exclusive contractual agreement did not "effect[] such a change in essential operative elements of the contract that further performance by [Energy was] rendered ineffective or impossible[.]" *Id.* Moreover, the

Court finds that (1) Energy accepted and retained the unpaid products from Central, and (2) Central's breach did not incapacitate Energy's ability to pay for the products in full.

On the other hand, Central submits that the $15,000 credit and waiver of associated late fees should be redeemed because it was tendered in consideration of the obligation by Energy to pay the reduced indebtedness in three installments.  Upon review of the evidence, the Court has failed to locate any agreement, implied or expressed, between the parties that would support Central's contention on this issue.

Therefore, for the reasons that have been stated above, the Court directs Energy to pay the remaining unpaid balance of $26,245 to Central.

## FINAL DETERMINATIONS

Accordingly, the Court (1) rejects Energy's request for damages and (2) grants Central's counter-claim for the reasons that have been set forth above.

IT IS SO ORDERED.


DATED:    March 27, 2006                              s/ Julian Abele Cook, Jr.
                Detroit, Michigan                             JULIAN ABELE COOK, JR.
                                                              United States District Judge


## Certificate of Service

I hereby certify that on March 27, 2006,  I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

                                                              s/ Kay Alford
                                                              Courtroom Deputy Clerk